UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

KEVIN E. ENGLE,                          )
                                         )
        Plaintiff,                       )
                                         )
v.                                       )        CAUSE NO. 1:13-CV-00319
                                         )
CAROLYN W. COLVIN,                       )
Acting Commissioner of Social Security,  )
                                         )
        Defendant.                       )

## OPINION AND ORDER

        Plaintiff Kevin Engle appeals to the district court from a final decision of the

Commissioner of Social Security denying his application under the Social Security Act (the

"Act") for a period of disability and Disability Insurance Benefits ("DIB").[1] (Docket # 1.)  For

the following reasons, the Commissioner's decision will be REVERSED, and the case will be

REMANDED for further proceedings in accordance with this Opinion and Order.

## I.  PROCEDURAL HISTORY

        Engle applied for DIB in November 2010, alleging disability as of July 1, 2010.[2] (Tr.

199-201.)  The Commissioner denied his application initially and upon reconsideration, and

Engle requested an administrative hearing. (Tr. 106-08, 110-12, 114-15.)  On May 14, 2012, a

hearing was conducted by Administrative Law Judge ("ALJ") Valencia Jarvis, at which Engle,

who was represented by counsel, and a vocational expert testified. (Tr. 29-70.)  On June 8, 2012,

_____

        [1] All parties have consented to the Magistrate Judge. (Docket # 17); *see* 28 U.S.C. § 636(c).

        [2] This is Engle's fourth application for DIB. (*See* Tr. 10, 171-73, 182-85, 189-91, 590.)

the ALJ rendered an unfavorable decision to Engle, concluding that he was not disabled because despite the limitations caused by his impairment, he could perform a significant number of jobs in the national economy. (Tr. 10-18.)  The Appeals Council denied Engle's request for review, at which point the ALJ's decision became the final decision of the Commissioner. (Tr. 1-3.)

Engle filed a complaint with this Court on November 4, 2013, seeking relief from the Commissioner's final decision. (Docket # 1.)  In this appeal, Engle argues that: (1) the ALJ erred by finding that Engle's impairment or combination of impairments did not meet or equal a listing; (2) the ALJ's determination that he had borderline intellectual functioning, rather than mild mental retardation, was not supported by substantial evidence; and (3) the ALJ failed to properly review and weigh the medical source opinions of record. (Docket # 16.)

## II.  FACTUAL BACKGROUND[3]

### A.  Background

At the time of the ALJ's decision, Engle was twenty-seven years old (Tr. 18, 199); had a certificate of completion from high school with special education classes (Tr. 33, 38, 219, 306); and had past work experience as a restaurant worker (Tr. 306).  Engle alleged in his DIB application that the following medical conditions limit his ability to work: learning problems/learning disability (unable to read or write), bipolar disorder, schizophrenia, depression, anxiety, and suicide attempts. (Tr. 305.)  Because Engle does not challenge the ALJ's findings about his physical condition, the Court will focus on the evidence pertaining to his mental limitations.

At the hearing, Engle testified that he lives by himself in a government-subsidized

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 769-page administrative record necessary to the decision.

apartment. (Tr. 36.)  His mother pays for his utilities; he is on Medicaid and receives food stamps. (Tr. 37-38.)  He stated that he can perform household chores, but does not do so when he feels depressed. (Tr. 56-57.)

Engle testified that although he obtained a certificate of completion from high school, he failed the ISTEP, took special education classes, and was held back once or twice in kindergarten or first grade. (Tr. 38-39, 41-42.)  He stated that he can perform basic addition and subtraction, provided that he writes it down on paper, but has difficulty with multiplication and division. (Tr. 39-40, 52-53.)  He articulated that he could "read a little bit" (Tr. 40); he elaborated that he could probably read and understand some, but not all, of a lengthier text, provided that someone read it to him first. (Tr. 40, 52-53.)  He needs help to fill out applications, and when obtaining his driver's license, someone had to read him the questions; he attempted the written test for his driver's license four or five times before he passed. (Tr. 40-41.)  He is, however, able to use a computer to email friends. (Tr. 59.)

As to his psychological symptoms, Engle testified that up to four times a month he hears voices and talks to people who are not there. (Tr. 43-44, 62.)  He feels depressed (Tr. 46, 54, 57, 61); has anxiety, particularly when around a lot of people (Tr. 43, 45-46, 60-61); and has difficulty concentrating on tasks (Tr. 45-46).  He reported having problems in the past with getting along with supervisors and coworkers. (Tr. 47, 50.)  Engle was not currently taking any medication or participating in counseling for his psychological symptoms (Tr. 45), explaining that he lacked the funds for co-payments and transportation (Tr. 57-58).

*B. Engle's Educational Records*

Engle's high school educational record reflects that he obtained a certificate of completion in 2003 with special education classes, but failed the ISTEP. (Tr. 220-22.) An April 2002 school report reflected that Engle had a mild mental disability, and his individualized educational program for the twelfth grade indicated that he should spend no more than twenty percent of his time in a regular classroom. (Tr. 395, 398, 404.)

*C. Summary of the Relevant Medical Evidence*

In September 2007, Engle underwent a consultative psychological evaluation by Carol Lehmann, a counselor, and Neal Davidson, Ph.D. (Tr. 416-23.) He was not taking any medications and had not seen a doctor in four years. (Tr. 416.) He was working twenty-five hours a week at Burger King at the time. (Tr. 417.) The evaluation indicated that Engle had good insight for his age, but some problems with self-esteem; his stream of mental activity was logical, coherent, clear, and organized. (Tr. 418.) He denied suicidal thoughts, but stated that he sometimes hears voices and talks to others who are not there. (Tr. 418.) WAIS-III testing revealed a verbal IQ of 64, a performance IQ of 68, and a full scale IQ of 63. (Tr. 423.) The examiners noted, however, that Engle's test-taking style cast some doubt on the validity of his scores, "because he quickly gave up on any task he found difficult"; therefore, they considered the scores "a conservative estimate of his ability level." (Tr. 422-23.) Engle was assigned a Global Assessment of Functioning ("GAF") score of 65 and diagnosed with a mood disorder, not otherwise specified ("NOS"); anxiety disorder, NOS; and mild mental retardation.[4] (Tr. 421.)

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 21-30 reflects behavior that is considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or

The following month, William Shipley, Ph.D., a state agency psychologist, reviewed Engle's record. (Tr. 425-27.) In a mental activity checklist, he found that Engle was moderately limited in his ability to understand, remember, and carry out detailed instructions; complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and accept instructions and respond appropriately to criticism from supervisors. (Tr. 425-26.) Engle was not significantly limited in the remaining sixteen mental activities. (Tr. 425-26.) Dr. Shipley, noting Engle's work history and daily activities, concluded that he was "able to complete simple, repetitive tasks on a sustained basis." (Tr. 427.)

In July 2008, Engle underwent a psychological assessment by James Cates, Ph.D. (Tr. 445-50.) His profile suggested that he has little interest in interactions or emotional intimacy with others and is restless and dissatisfied in life. (Tr. 448.) Upon WAIS-III testing, Engle scored a verbal IQ of 68, a performance IQ of 81, and a full scale IQ of 72. (Tr. 448.) These results place his verbal functioning in the upper end of the extremely low range, performance functioning in the low average range; and full scale IQ in the borderline range. (Tr. 448.) He perceived that Engle might experience significantly low frustration tolerance, poor anger management, and avoidance of people, which would limit his ability to manage effectively in

---

an inability to function in almost all areas (e.g., stays in bed all day; has no job, home, or friends). *Id.* A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* And, a GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.*

competitive employment (Tr. 449); he indicated that if Engle were to work competitively, he may need to consider a "low-stress, low-pace or part-time employment opportunity" (Tr. 450). Dr. Cates assigned Engle a GAF of 50 and diagnoses of major depressive disorder, recurrent, mild; other (or unknown) substance abuse (provisional); and avoidant personality traits. (Tr. 449.) He opined that Engle might benefit from antidepressant medication, an anger management group, and Alcoholics or Narcotics Anonymous. (Tr. 449.)

In August 2008, Engle saw Dr. Davidson and clinician Michelle Cross for another evaluation. (Tr. 453-63.) His judgment appeared good, and his stream of mental activity logical; he tended, however, to exaggerate his medical symptoms. (Tr. 458, 460.) He complained of hearing voices and past suicidal thoughts. (Tr. 458.) WAIS-III testing revealed a verbal IQ score of 66, a performance IQ of 87, and a full scale IQ of 74; the examiners noted that these scores might be elevated due to "practice effect," since he had taken the test just two weeks earlier. (Tr. 462.) Engle was assigned a GAF of 62 and diagnosed with a depressive disorder, NOS; and borderline intellectual functioning. (Tr. 460.)

In September 2008, F. Kladder, Ph.D., a state agency psychologist, reviewed Engle's record. (Tr. 467-483.) On the psychiatric review technique, Dr. Kladder found that Engle had mild limitations in activities of daily living and maintaining social functioning, and moderate limitations in maintaining concentration, persistence, or pace. (Tr. 477.) In a mental residual functional capacity assessment, Dr. Kladder indicated that Engle was moderately limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an

unreasonable number and length of rest periods; and accept instructions and respond appropriately to criticism from supervisors. (Tr. 481-82.)  Engle was not significantly limited in the remaining fifteen mental activities. (Tr. 481-82.)  Dr. Shipley, noting Engle's work history and daily activities, concluded that he appeared to have the mental RFC for simple, repetitive tasks with moderate limitations in dealing with authority figures and in maintaining concentration, persistence or pace. (Tr. 483.)

In July 2009, Engle was admitted to the Northeastern Center after an overdose on Tylenol and Ativan. (Tr. 583-86.)  A clinical consultation prior to admission reflected diagnoses of bipolar disorder with psychotic features, borderline intellectual functioning to mild mental retardation, and a learning disability. (Tr. 588.)  Upon admission, Dr. Jay Patel diagnosed him with major depression, single episode; dysthymia; borderline intellectual ability to mild mental retardation; and a learning disability (Tr. 583).  Engle was assigned a GAF of 25 upon admission and 50 upon discharge. (Tr. 583.)

In August 2009, Engle reported to the Northeastern Center that he had stopped taking the medications that were prescribed during his recent hospitalization, claiming that there was no change and he did not like the side effects. (Tr. 508.)  He became agitated during the session and left before the intake process was completed. (Tr. 508.)

In January 2010, Engle underwent a psychological examination by Andrew Davis, Ph.D. (Tr. 526-29.)  His affect and mood were depressed, but his thought processes were logical and his behavior goal-oriented; he was attentive throughout the assessment. (Tr. 527.)  His recent memory was mildly impaired and his verbal abilities below average, but his judgment appeared relatively intact; basic calculation skills were below average. (Tr. 529.)  Dr. Davis wrote that

Engle's deficits in sustained attention and recent memory, as well as his low energy, low motivation, and poor concentration, would likely interfere with his ability to attend to simple, repetitive tasks for a two-hour period. (Tr. 528.) He also opined that Engle would likely require extra supervision and accommodations due to his low energy and motivation, difficulty concentrating on tasks, and borderline cognitive functioning. (Tr. 528.) Dr. Davis assigned him a GAF of 41 to 50 and diagnosed him with a major depressive disorder, recurrent, moderate; anxiety disorder, NOS; and rule-out borderline intellectual functioning. (Tr. 529.)

That same month, Maura Clark, Ph.D., a state agency psychologist, reviewed Engle's record. (Tr. 532-49.) In the psychiatric review technique, Dr. Clark found that Engle had mild limitations in activities of daily living, but moderate limitations in maintaining social functioning and concentration, persistence, or pace. (Tr. 542.) In a mental residual functional capacity assessment, Dr. Clark indicated that Engle was moderately limited in his ability to understand, remember, and carry out detailed instructions; sustain an ordinary routine without special supervision; interact appropriately with the general public; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and set realistic goals or make plans independently of others. (Tr. 546-47.) Engle was not significantly limited in the remaining thirteen mental activities. (Tr. 481-82.)

Dr. Clark concluded that Engle's daily activities were inconsistent with a marked cognitive impairment, and that his work history undercut any suggestion that his intelligence limits his ability to perform simple tasks. (Tr. 548.) She noted a report from Engle's past employer stating that he demonstrated fine concentration; with guidance, worked well with others; and although started out slow, gained confidence and proved he could be counted on. (Tr.

548.)  Dr. Clark concluded that Engle may benefit from extra supervision on a new job and although he may have difficulty with work settings involving a large number of people, he "would be able to handle settings where there are fewer other persons in the work setting." (Tr. 549.)  She summarized:

> The evidence suggests that claimant can understand, remember, and carry-out simple tasks.  The claimant can relate on at least a superficial basis on an ongoing basis with co-workers and supervisors.  The claimant can attend to task for sufficient periods of time to complete tasks.  The claimant can manage the stresses involved with simple work.

(Tr. 549.)

In September 2010, Engle stated that he had been off his medications since June 2009. (Tr. 578.)  He claimed he wanted to get back on medications to stop the auditory and visual hallucinations; he stated that the voices tell him to kill himself, but he denied any intention of acting on the commands. (Tr. 578.)  He was taking classes at Ivy Tech, but was having difficulty due to his learning disability. (Tr. 578.)

On October 16, 2010, Engle was admitted to Meridian Services due to mild anxiety and hallucinations without suicidal ideation. (Tr. 558.)  He was diagnosed with bipolar disorder, NOS. (Tr. 558.)  On October 25, 2010, Engle's thought processes were bizarre, and his speech was rapid and disjointed; he was still hearing voices. (Tr. 577.)  He continued, however, to look for work and was planning to go back to school at Ivy Tech. (Tr. 577.)

In October 2010, Engle was evaluated by Dr. Boris Imperial, a psychiatrist at Meridian Services, stating that he wanted to get back on medication. (Tr. 551-52.)  Engle reported auditory hallucinations and suicidal ideas; he talked in a pressured, flighty manner. (Tr. 552.)  His concentration and insight were poor, and his judgment questionable. (Tr. 552.)  Dr. Imperial

estimated his intelligence to be in the moderate mental retardation range. (Tr. 552.) He assigned

Engle a GAF score of 35 and diagnosed him with a major depressive disorder, recurrent;

generalized anxiety disorder; and moderate mental retardation. (Tr. 552.)

In March 2011, Dr. Davidson and clinician Lezlee Jones completed another

psychological examination. (Tr. 590-98.) Engle was off his medications; he reported feeling

paranoid and that he heard voices occasionally and had suicidal ideas. (Tr. 590.) He had poor

insight and tended to exaggerate his symptoms; he reported four previous suicide attempts. (Tr.

594-95.) Dr. Davidson assigned him a GAF of 60 and diagnosed him with depressive order,

NOS; and borderline intellectual functioning, by report. (Tr. 597.) His prognosis was guarded.

(Tr. 597.) Dr. Davidson concluded: "[Engle] is able to understand, remember and carry out

simple directions. His ability to perform activities and interact with the public without

interference from psychologically based problems appears limited due to his low tolerance to

frustration and impulsivity." (Tr. 598.) He was not capable of managing his own funds. (Tr.

598.)

That same month, Dr. Clark again reviewed Engle's record. (Tr. 630-46.) Dr. Clark's

findings in the psychiatric review technique mirrored those in her January 2010 review–mild

restrictions in daily living activities and moderate difficulties in maintaining social functioning

and concentration, persistence, or pace. (*Compare* Tr. 640, *with* Tr. 542.) Dr. Clark indicated in

a mental RFC assessment that Engle was moderately limited in his ability to understand,

remember, and carry out detailed instructions; maintain attention and concentration for extended

periods; sustain an ordinary routine without special supervision; interact appropriately with the

general public; and get along with coworkers or peers without distracting them or exhibiting

behavioral extremes. (Tr. 644-45.)  Engle was not significantly limited in the remaining fourteen mental activities. (Tr. 644-45.)

Dr. Clark found Engle's statements of symptom severity to be "at best partially credible," reiterating that although his symptoms could cause some impediment to work situations involving large numbers of people, he would be able to handle settings where there were fewer people in the work setting. (Tr. 464.)  Dr. Clark further opined:

> The totality of evidence in [the] file suggests that the claimant is able to: understand, carry out and remember simple instructions; . . . make judgments commensurate with functions of unskilled work; . . . respond appropriately to brief supervision and interactions with coworkers and work situations; [and] . . . deal with changes in a routine work setting.

(Tr. 646.)  Another state agency psychologist, Amy Johnson, Ph.D., later affirmed Dr. Clark's opinion. (Tr. 657; *see* Tr. 78.)

In April 2011, Engle underwent a psychiatric evaluation by Dr. Sylvia Rutten at the Northeastern Center. (Tr. 679-80.)  After Engle reported that he used marijuana once a month, Dr. Rutten cautioned him against using marijuana because it could interfere with medications; Engle then abruptly left the evaluation, stating that he would not take a drug test and that he instead would get medications from his family doctor. (Tr. 679-80.)  Dr. Rutten estimated his GAF at 45 and indicated diagnoses of cannabis abuse, rule out dependence; probably depressive disorder; history of learning disorder; and rule out personality disorder. (Tr. 680.)

In May 2011, Engle was seen at Meridian Services, reporting that he has about four panic attacks a week, some recent suicidal ideation, and auditory command hallucinations telling him to hurt himself. (Tr. 659.)  He had a current GAF of 58 and a previous GAF of 35; he was assigned a diagnosis of bipolar disorder, NOS. (Tr. 659.)  The entry noted that Engle had made

only minimal progress, was not consistent in complying with treatment, and had simply stopped coming to sessions. (Tr. 659.)

In July 2011, Engle's chart was closed at the Northeastern Center, noting that he had been in for just one appointment since his intake three months earlier. (Tr. 672.) He had not called or shown up on multiple occasions, and had not returned the Center's phone calls. (Tr. 672.) The discharge summary reflected a GAF of 50 and diagnoses of major depression, recurrent, moderate; and phase-of-life problem. (Tr. 672.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record, but does not "reweigh the evidence, resolve conflicts, decide questions of credibility," or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp

of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

# IV.  ANALYSIS

## *A.  The Law*

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520.  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.*  The

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

burden of proof lies with the claimant at every step except the fifth, where it shifts to the

Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On June 8, 2012, the ALJ issued the decision that ultimately became the Commissioner's

final decision. (Tr. 10-18.)  She found at step one that Engle had not engaged in substantial

gainful activity since his alleged onset date; and at step two, that he had the following severe

impairments: bradycardia; borderline intellectual functioning; depression, NOS; and generalized

anxiety disorder. (Tr. 12.)  At step three, the ALJ determined that Engle's impairment or

combination of impairments were not severe enough to meet a listing. (Tr. 12.)

Before proceeding to step four, the ALJ assigned Engle the following RFC:

> [T]he claimant has the residual functional capacity to perform a full range of work
> at all exertional levels but with the following nonexertional limitations:  He
> requires simple, routine, and repetitive tasks with work that is free of strict
> production quotas.  He requires brief and superficial interactions with the public,
> coworkers, and supervisors.

(Tr. 14.)  Based on this RFC and the vocational expert's testimony, the ALJ concluded at step

four that Engle was unable to perform any of his past work. (Tr. 16.)  The ALJ then concluded at

step five that Engle could perform a significant number of unskilled, medium-level exertion jobs,

including automotive detailer, laundry worker, and industrial cleaner. (Tr. 17.)  Accordingly,

Engle's claim for DIB was denied. (Tr. 18.)

## C. The ALJ's Step-Three Finding Will Be Remanded to Consider Listing 12.05C

At step three, the ALJ discussed Listings 12.02, organic mental disorders; 12.04,

affective disorders; and 12.06, anxiety-related disorders, but she never mentioned–much less

analyzed–Listing 12.05, mental retardation.  Engle argues that he meets the requirements of

Listing 12.05C, and thus, that the ALJ's oversight constitutes reversible error. The Commissioner acknowledges that the ALJ failed to mention Listing 12.05C, but asserts that the error was harmless, urging that the ALJ "reasonably demonstrated her view that [Engle] could not meet Listing 12.05(C) because he did not meet the threshold requirement that he exhibit 'deficits in adaptive functioning.'" (Mem. in Supp. of the Commissioner's Decision ("Mem. in Supp.") 11.)

1. The ALJ's Duty with Respect to a Listing

"The Listing describes impairments that are considered presumptively disabling when a claimant's impairments meet the specific criteria described in the Listing." *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999) (citing 20 C.F.R. § 404.1525(a)). "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); *accord Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003); *Scott v. Barnhart*, 297 F.3d 589, 595-96 (7th Cir. 2002).

As stated above, the ALJ failed to mention, much less analyze, Listing 12.05C at step three. *See Barnett*, 381 F.3d at 668 ("The ALJ never identified by name the listing relevant to [the claimant's] disability claim."). Thus, the ALJ's consideration of whether Engle's impairments satisfied or equaled listing 12.05C was nonexistent; that is, even less than "perfunctory," since she failed at step three to provide "any explanation of why [Engle's intellectual] impairments are not severe enough to qualify as disabled within the meaning of the Act." *Allen v. Barnhart*, 408 F. Supp. 2d 598, 602 (N.D. Ill. 2006) (concluding that the ALJ's

step-five analysis that the claimant was able to perform other work in the economy was "premature and inherently flawed because of the incomplete step three analysis"); *see Barnett*, 381 F.3d a 670 (reversing the ALJ's decision because the Court could not determine if the ALJ considered whether the claimant, who was not credible, had an impairment that equaled a listing).

Indeed, the ALJ does not launch into any discussion of Engle's IQ scores and the evidence concerning his intellectual limitations until after she rendered her step-three finding. (*See* Tr. 12-15.) Consequently, it is unclear from the ALJ's decision what impact, if any, this evidence had on her step-three determination. *Brindisi*, 315 F.3d at 786 ("[T]he ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires h[er] to do." (quoting *Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir. 1985))). Thus, the ALJ's step-three finding concerning Engle's intellectual impairments is "devoid of any analysis that would enable meaningful judicial review" with respect to Listing 12.05C. *Id*. ("The omission of any discussion of [the claimant's] impairment in conjunction with the listings frustrates any attempt at judicial review . . . .").

2. <u>The Requirements of Listing 12.05C</u>

But the Commissioner asserts that the ALJ's failure to discuss Listing 12.05C at step three is harmless because later in the decision the ALJ reasonably demonstrated that Engle did have the requisite deficits in adaptive functioning that the Listing requires. That is, the Commissioner contends that Engle cannot show that he met all of the requirements of Listing 12.05C.

Listing 12.05C provides in relevant part:

12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . .

C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Pt. 404, Subpt P, App. 1 § 12.05.  "[T]he structure of Listing . . . 12.05 indicates that a claimant must show both that he meets the listing's definition of mental retardation *and* that he meets the required severity by satisfying the requirements in either A, B, C, or D." *Smallwood v. Astrue*, No. 2:08-cv-85, 2009 WL 2475272, at *8 (N.D. Ind. Aug. 11, 2009) (emphasis in original) (citing *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006)).

When boiled down, to meet Listing 12.05C, a claimant must show: (1) significantly subaverage intellectual functioning with deficits in adaptive functioning prior to age twenty-two; (2) a valid verbal, performance, or full scale IQ of 60 through 70; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function. *Charette v. Astrue*, 508 F. App'x 551, 553 (7th Cir. 2013) (unpublished); *Adkins v. Astrue*, 226 F. App'x 600, 605 (7th Cir. 2007) (unpublished); *Novy v. Astrue*, 497 F.3d 708, 709 (7th Cir. 2007); *Anderson v. Astrue*, No. 4:10-cv-91, 2011 WL 4899990, at *5 (N.D. Ind. Oct. 14, 2011); *Smallwood*, 2009 WL 2475272, at *8.

3.  Prong Three of Listing 12.05C

The Court will begin with the third prong–a physical or other mental impairment

imposing an additional and significant work-related limitation of function–because Engle easily clears this hurdle.

Courts have concluded that an ALJ's finding of a "severe" additional physical or mental impairment at step two satisfies the third prong of Listing 12.05C. *Smith v. Colvin*, No. 13-c-306, 2014 WL 1271188, at *7 (E.D. Wis. Mar. 26, 2014) ("The law in this area has progressed, . . . and courts in this [C]ircuit now typically equate the two standards."); *Washington v. Astrue*, No. 2:10-cv-367, 2012 WL 3108872, at *7 (N.D. Ind. July 31, 2012); *Anderson*, 2011 WL 4899990, at *6; *Anthony v. Astrue*, No. 1:10-cv-136, 2011 WL 2728059, at *6 (S.D. Ind. July 12, 2011); *Elster v. Barnhart*, No. 01 C 4085, 2003 WL 124432, at *5 (N.D. Ill. Jan. 13, 2003). Here, the ALJ found at step two that Engle's borderline intellectual functioning, bradycardia, depression, and generalized anxiety disorder were all severe impairments.

Therefore, Engle has additional physical and mental impairments–bradycardia, depression, and anxiety–that impose significant work-related limitation of function as required by prong three of Listing 12.05C.

### 4. Prong Two of Listing 12.05C

Engle has three sets of IQ scores to consider when analyzing the second prong of Listing 12.05C–a valid verbal, performance, or full scale IQ of 60 through 70. His first WAIS-III testing was in September 2007 at age twenty-three and revealed a verbal IQ of 64, a performance IQ of 68, and a full scale IQ of 63. (Tr. 423.) His second scores were from testing in July 2008 and resulted in a verbal IQ of 68, a performance IQ of 81, and a full scale IQ of 72. (Tr. 448.) And his third scores were from August 2008, which produced a verbal IQ score of 66, a performance IQ of 87, and a full scale IQ of 74. (Tr. 462.)

The ALJ mentioned the IQ scores only once in her decision and, as explained above, this was in the context of reviewing the medical evidence when assigning an RFC, *not* earlier at step three when determining whether Engle met or equaled a listing. In considering the scores, the ALJ stated: "[Engle] took multiple IQ tests and his Full Scale IQ results were 63, 72, and 74. I give greatest weight to the most recent result. In any event, his borderline intellectual functioning was consistent with all three scores." (Tr. 15-16 (citations omitted).)

The ALJ's reasoning, or rather lack thereof, concerning Engle's IQ scores creates several problems. First, to reiterate, the ALJ never considered the IQ scores and Listing 12.05C at step three. Not only were Engle's first set of IQ scores all within the Listing's range, but his verbal score was consistently within the range on all three tests. The second prong of Listing 12.05C is satisfied if just *one* of the three types of IQ scores (verbal, performance, or full scale) falls within the range. 20 C.F.R. Pt. 404, Subpart P, App. 1 § 12.00D(6)(c); *see Ortiz v. Apfel*, No. 98 C 4552, 1999 WL 984399, at *4 (N.D. Ill. Oct. 25, 1999) ("For purposes of Listing 12.05C, the lowest of the three derived IQ scores is used to determine whether the Listing is met."); *see, e.g.*, *Thomas v. Astrue*, No. 09 C 7851, 2011 WL 5052049, at *5 (N.D. Ill. Oct. 19, 2011) (finding that the ALJ erred when rejecting Listing 12.05C where claimant's verbal IQ score was at Listing level but his performance and full scale IQ scores were not).

Second, the ALJ's assertion that Engle's three full scale IQ scores were "consistent" with borderline intellectual functioning is simply not correct. Engle's first full scale score fell within the "extremely low" range, which is consistent with mental retardation not borderline intellectual functioning. (Tr. 423); *see Mendez*, 439 F.3d at 362 ("[A]n IQ of 70, which figures prominently in the criteria for disability based on mental retardation, is at the borderline between retardation

and normal, if low, ability.").

The third problem is that the ALJ assigned "greatest weight" to Engle's August 2008 full scale score without ever discussing its validity–a requirement of Listing 12.05C. (Tr. 16.) Dr. Davidson and Ms. Croce indicated that Engle's August 2008 scores might be "artificially elevated because of practice effect" and "may provide an overestimation of his ability[.]" (Tr. 462.) Similarly, in connection with the September 2007 scores, Dr. Davidson and Ms. Lehmann thought the nature of Engle's test-taking style "would cast some doubt on the validity of [his] scores, and . . . would seem to be only a conservative estimate of his ability level." (Tr. 423.)

But the record does not reflect that Dr. Cates questioned the validity of Engle's July 2008 scores. (Tr. 448-50.) And as stated earlier, nor did the ALJ discuss the validity of the IQ scores. Therefore, on this record, Engle's July 2008 verbal IQ score of 68 satisfies prong two of the Listing. (Tr. 448-50); *see, e.g.*, *Anderson*, 2011 WL 4899990, at *6 (concluding that the ALJ must have believed prong two of Listing 12.05C was satisfied where neither he nor the doctors who administered or analyzed the test questioned the IQ score's validity).

5. Prong One of Listing 12.05C

Engle's low IQ score and additional physical and mental impairments, however, are not enough by themselves to meet Listing 12.05C. He must also demonstrate significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; that is, an onset of the impairment before age twenty-two. *See Novy*, 497 F.3d at 709.

The Seventh Circuit Court of Appeals has stated that the term "deficits in adaptive functioning" in Listing 12.05C means an "inability to cope with the challenges of ordinary

everyday life." *Id.* at 710 (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 42 (4th ed. 2000)); *accord Charette*, 508 F. App'x at 553. "That definition requires the ALJ to make a qualitative, not quantitative assessment. A claimant need not display *no* adaptive functioning to meet the Listing, but evidence that the claimant has *some* challenge or challenges is not conclusive either." *Thackery v. Astrue*, No. 1:11-cv-1488, 2013 WL 1319595, at *7 (S.D. Ind. Mar. 29, 2013) (emphasis in original). "Although low IQ scores are indicative of retardation, other facts, such as the claimant's life activities and employment history, must be considered and weighed and properly play into the ALJ's analysis." *Adkins*, 226 F. App'x at 605.

Here, the Commissioner argues that although the ALJ failed to discuss Listing 12.05C, she "reasonably demonstrated her view" that Engle did not exhibit the requisite deficits in adaptive functioning. (Mem. in Supp. 11.) The ALJ's discussion of Engle's intellectual deficits, however, was "cursory at best." *Smith v. Colvin*, No. 13-C-306, 2014 WL 1271188, at *6 (E.D. Wis. Mar. 26, 2014).

After acknowledging that Engle was in special education in school and his claims that he needed help with reading and finances, the ALJ discounted Engle's intellectual deficiencies because he "had the mental capability to use a computer and play video games"; "was able to respond with relevant answers to [the ALJ's] questions at the hearing, as well as provide detailed statements on his impairments to physicians who treated him where no physician indicated that he was unable to express himself"; and "was working when he went to the emergency room for treatment[.]" (Tr. 15.)

The ALJ also seemed to heavily rely on the fact that Engle was diagnosed with

borderline intellectual functioning, rather than mental retardation. But there are two problems with this position. First, it ignores that Dr. Davidson did indeed diagnose Engle with mild mental retardation after the first IQ test in September 2007 (Tr. 421), and that Dr. Imperial diagnosed him with moderate mental retardation in October 2010 (Tr. 552). "Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling."[6] *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *see Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

The second problem is that a claimant's diagnosis of mental retardation or borderline intellectual functioning is not determinative as to whether he can satisfy Listing 12.05C. *See Thomas v. Astrue*, No. 09 C 7851, 2011 WL 5052049, at *6-7 (N.D. Ill. Oct. 19, 2011) (rejecting the Commissioner's argument that a diagnosis of borderline intellectual functioning precludes a finding that the claimant meets Listing 12.05C); *Pedro v. Astrue*, 849 F. Supp. 2d 1006, 1010 (D. Or. 2011) (collecting cases); *Huber v. Astrue*, No. CV10-8043-PCT-DGC, 2010 WL 4684021, at *4 (D. Ariz. Nov. 12, 2010) (collecting cases and rejecting the Commissioner's argument that because claimant was diagnosed with borderline intellectual functioning she did not meet Listing 12.05); *King v. Barnhart*, No. 1:06-cv-381, 2007 WL 968746, at *4 (S.D. Ind. Feb. 26, 2007)

---

[6] The Commissioner asserts that the ALJ's omission is harmless because Dr. Davidson later diagnosed Engle with borderline intellectual functioning (Tr. 460), and Dr. Imperial's subsequent notes did not include a diagnosis of mental retardation (Tr. 558, 560, 565, 567, 572). Thus, as the Commissioner sees it, Dr. Davidson "reversed" Engle's diagnosis of mild mental retardation, and Dr. Imperial's diagnosis lacked the objective support of IQ testing. (Mem. in Supp. 8.) But "the ALJ (not the Commissioner's lawyers) must build an accurate and logical bridge from the evidence to [her] conclusion." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal quotation marks and citation omitted).

("The initial paragraph of the Listing does not require a diagnosis of 'mental retardation.'").

But the Commissioner also argues that the ALJ heavily relied upon the opinion of Dr. Clark, the state agency psychologist who reviewed Engle's record in March 2011 and determined that Engle did not meet a listing. (Mem. in Supp. 11.) Indeed, the ALJ did rely upon Dr. Clark's opinion. (Tr. 16.) Yet, Dr. Clark checked boxes on the psychiatric review technique indicating that her medical disposition was based upon 12.02, organic mental disorders; 12.04, affective disorders; and 12.06, anxiety-related disorders. (Tr. 630.) She left the box for 12.05, mental retardation, however, unchecked. (Tr. 630.) Accordingly, she rated Engle's degree of limitation under Listings 12.02, 12.04, and 12.06, *not* 12.05. (Tr. 630, 640.)

Dr. Clark did, however, summarize the evidence concerning Engle's intellectual deficits, activities of daily living, and work history in her narrative, although she never used the term "deficits in adaptive functioning" as articulated in Listing 12.05. (Tr. 642, 646.) Dr. Clark concluded that Engle could perform unskilled work, provided he had only brief and superficial interaction with others, and that he was moderately limited in his abilities to sustain an ordinary routine without "special supervision" and maintain attention and concentration for extended periods. (Tr. 644.)

Dr. Clark's call for "special supervision" is relevant to Listing 12.05's prong requiring deficits in adaptive functioning.[7] (Tr. 644.) Indeed, Dr. Davis in January 2010 *also* opined that Engle would likely require "extra supervision" due to among other things, "borderline cognitive functioning." (Tr. 528.) Therefore, contrary to the ALJ's representation otherwise (Tr. 16), the record *does* contain medical source opinions indicating that Engle has limitations greater than

---

[7] The RFC assigned by the ALJ, and the hypothetical posed to the vocational expert at step five, however, did not incorporate this limitation. (*See* Tr. 67-69.)

those determined in the ALJ's decision. (Tr. 16.) Accordingly, the factual record may require further development with respect to deficits in adaptive functioning and what type of "special" or "extra" supervision Engle may need.

Indeed, considering Engle's young age and lack of intervening medical event, there is no real dispute that any deficits in adaptive functioning were initially manifested during his developmental period. "[I]ntellectual abilities are generally presumed to remain stable over time . . . ." *Warren v. Colvin*, __ F. App'x __, 2014 WL 3409697, at *3 (7th Cir. July 15, 2014) (unpublished); *see, e.g.*, *Maresh v. Barnhart*, 438 F.3d 897, 900 (8th Cir. 2006) (finding that special education classes during school years and trouble with reading, writing, and math constituted evidence of deficits in adaptive functioning at a young age); *King*, 2007 WL 968746, at *3-4 (finding that claimant's participation in special education classes from fifth grade through twelfth grade and his repeat of kindergarten and first grade constituted evidence of deficits in adaptive functioning prior to the age of twenty-two for purposes of Listing 12.05C, even though claimant later managed to obtain his driver's license and work at several jobs with the assistance of friends and family).

In sum, the ALJ erred by failing to analyze at step three whether Engle's intellectual impairments met or equaled Listing 12.05C–a listing critical to his case. Although the Commissioner urges that the evidence of record adequately demonstrates that Engle could not satisfy the first prong of Listing 12.05C, the ALJ's failure to discuss the evidence in light of Listing 12.05's analytical framework leaves the Court with "reservations as to whether [the ALJ's] factual assessment addressed adequately the criteria of the listing." *Scott*, 297 F.3d at 595-96.

Consequently, this case will be remanded so that the ALJ may properly perform and articulate her analysis concerning whether Engle satisfies Listing 12.05C.[8] *See Warren*, 2014 WL 3409697, at *3 (remanding for additional IQ testing to better evaluate the claimant's intellectual ability with respect to Listing 12.05); *Scott*, 297 F.3d at 595-96 (remanding where the ALJ failed to provide meaningful discussion of certain medical evidence relevant to whether the child claimant satisfied the equivalent of Listing 12.05 for children); *Anderson*, 2011 WL 4899990, at *7 (remanding the ALJ's step-three finding where the ALJ "cherry-picked" the evidence and failed to minimally articulate his reasoning as to the first prong of Listing 12.05C); *Gill v. Astrue*, No. 09-cv-719, 2011 WL 4708046, at *6-7 (S.D. Ill. Oct. 14, 2011) (remanding where the ALJ did not discuss deficits in adaptive functioning with respect to Listing 12.05); *Vander Linden v. Astrue*, No. 09-C-534, 2010 WL 1417931, at *6-7 (E.D. Wis. Apr. 7, 2010) (remanding where the ALJ did not reference Listing 12.05 and provided nothing more than a superficial analysis).

---

[8] Engle requests that the Court reverse the ALJ's decision and remand for an outright award of benefits under Listing 12.05C. But "an award of benefits is appropriate only where all factual issues have been resolved and the record supports a finding of disability." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 356-57 (7th Cir. 2005) (internal quotation marks and citation omitted); *see Burroughs v. Massanari*, 156 F. Supp. 2d 1350, 1367-68 (N.D. Ga. 2001) (articulating that the court may remand the case for an award of DIB where the Commissioner "has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability *without any doubt*") (emphasis added). Here, the Court cannot conclude that all of the factual issues have been resolved and that the record supports a finding of disability.

Also, because a remand is warranted on Engle's step-three argument, the Court need not reach his remaining two arguments. Nevertheless, the Court notes that Engle's assertion that the ALJ selectively reviewed the medical evidence is not without some merit. As observed above, the ALJ failed to mention, much less discuss, that Engle was diagnosed with mental retardation on at least two occasions; that he was hospitalized in July 2009 for a suicide attempt; and that Dr. Clark and Dr. Davis stated he needed "special" or "extra" supervision to perform sustained, simple tasks. (Tr. 528, 644.) The ALJ also adopted the highest full scale IQ score of record without considering Dr. Davidson's statements questioning its validity. To reiterate, an ALJ may not "ignore an entire line of evidence that is contrary to the ruling," *Terry*, 580 F.3d at 477, or "simply cherry-pick facts that support a finding of non-disability," *Denton*, 596 F.3d at 425.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.  The Clerk is directed to enter a judgment in favor of Engle and against the Commissioner.

SO ORDERED.

Enter for this 25th day of July, 2014.

S/Roger B. Cosbey_____
Roger B. Cosbey,
United States Magistrate Judge